U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

**Signed December 15, 2005** **United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| RANDALL MARLON HURST AND, STACY JEAN HURST, | § | CASE NO. 04-50868-RLJ-7 |
| | § | |
| Debtors | § | |
| MANHEIM AUTOMOTIVE FINANCIAL SERVICES, INC., | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | ADVERSARY NO. 04-5048 |
| | § | |
| RANDALL MARLON HURST, | § | |
| | § | |
| Defendant | § | |

**MEMORANDUM OPINION**

Plaintiff Manheim Automotive Financial Services, Inc. ("Manheim") objects under section 523(a)(2)(A) of the Bankruptcy Code to defendant Randall Marlon Hurst ("Hurst") receiving a discharge in his bankruptcy case of the obligation owed by Hurst to Manheim.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Memorandum Opinion contains the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

**Statement of Facts**

Hurst and his wife, Stacy Jean Hurst, filed this chapter 7 proceeding on July 26, 2004. The allegations in this suit center around an inventory financing arrangement between Manheim and Hurst Flores #1, Inc. d/b/a Family Auto ("Family Auto"), of which Hurst is the principal, and, specifically, twelve transactions in which Manheim financed Family Auto's purchase of cars through an auto auction, Lone Star Auto Auction. The parties stipulated to the base facts that are subject of the controversy:

1. On or about the 15th day of December, 2001, Family Auto, a Texas corporation, by and through its president, executed and delivered to Manheim a Promissory Note and Inventory Security Agreement. Pursuant to the terms of such loan documents, and at the request of Family Auto, Manheim extended credit to Family Auto for the purchase of motor vehicles for resale by Family Auto. Hurst, in consideration of Manheim extending credit to Family Auto, guaranteed the payment of all debt owing by Family Auto to Manheim.

2. On or about the 28th day of June, 2004, Hurst, doing business as Genie Auto Sales, purchased a 1998 Chevrolet pickup bearing motor vehicle identification number 1GCHK34J8WF005843 for an unknown sum of money. On or about the 30th day of June, 2004, Family Auto purchased through Lone Star Auto Auction in Lubbock, Texas, the 1998 Chevrolet pickup truck for $12,625. Manheim financed the purchase of the vehicle for Family Auto. It was later repossessed and sold by Manheim.

3. On or about the 30th day of June, 2004, Family Auto purchased a 2001 Dodge Intrepid bearing motor identification number 2B3HD46R01H639840 through Lone Star Auto Auction in Lubbock, Texas, for $7,875. The seller of the car was Roscoe White of CLF Century & Loan Finance, Inc. Roscoe White was the accountant for and a business associate of Hurst. Manheim financed the purchase of the 2001 Dodge Intrepid for Family Auto. The car was later repossessed and sold by Manheim.

4. On or about the 7th day of July, 2004, Family Auto purchased a 1997 Dodge Caravan bearing motor vehicle identification number 2B4GP4533VR292516 through Lone Star Auto Auction in Lubbock, Texas, for $4,275. The seller of this vehicle was again Roscoe White and CLF Century & Loan Finance, Inc. Manheim financed the purchase of the vehicle for Family Auto. The 1997 Dodge Caravan was later repossessed and sold by Manheim.

5. On or about the 7th day of July, 2004, Family Auto purchased a 2000 Ford Focus bearing motor vehicle identification number 1FAFP36P8YW229763 through Lone Star Auto Auction in Lubbock, Texas, for $5,780. The seller of the Ford Focus was Roscoe White and CLF Century & Loan Finance, Inc. Manheim financed the purchase of the car for Family Auto. The car was later repossessed and sold by Manheim.

6. On or about the 30th day of June, 2004, Family Auto purchased a 2000 Ford pickup bearing motor vehicle identification number 1FTYR14V9YPB60918 through Lone Star Auto Auction in Lubbock, Texas, for $8,980. The seller of the pickup was Roscoe White and CLF Century & Loan Finance, Inc. Manheim financed the purchase of the 2000 Ford pickup for Family Auto. The pickup was supposed to have been offered for sale by Family Auto and was represented as being in its inventory. The truck was later located in Wichita Falls, Texas.

7. On or about the 7th day of July, 2004, Family Auto purchased a 2001 Chevrolet Cavalier bearing motor vehicle identification number 1G1JC524217326764 through Lone Star Auto Auction in Lubbock, Texas, for $5,580. The seller of the Cavalier was Roscoe White and CLF Century & Loan Finance, Inc. Manheim financed the purchase of the Cavalier for Family Auto. The Cavalier was later repossessed and sold by Manheim.

8. On or about the 30th day of June, 2004, Family Auto purchased a 1996 Ford F-150 pickup truck bearing motor vehicle identification number 1FTEX15Y3TKA50602 through Lone Star Auto Auction in Lubbock, Texas, for $8,880. The seller of the pickup was Roscoe White and CLF Century & Loan Finance, Inc. Manheim financed the purchase of the F-150 for Family Auto. The F-150 was later repossessed and sold by Manheim.

9. On or about the 5th day of May, 2004, Family Auto purchased a 1994 Jeep Grand Cherokee bearing motor vehicle identification number 1J4GZ78Y6RC106921 through Lone Star Auto Auction in Lubbock, Texas, for $4,775. The seller of the Jeep was Roscoe White, individually. Manheim financed the purchase of the Jeep for Family Auto. The Jeep was later repossessed and sold by Manheim.[1]

10. On or about the 19th day of May, 2004, Family Auto purchased a 2001 Ford F-150 pickup bearing motor vehicle identification number 1FTRW08L61KC34332 through Lone Star Auto Auction in Lubbock, Texas, for $23,100. The seller of the pickup was the debtor and

[1]At the same time, *i.e.*, May 5, 2004, Family Auto "purchased" a 1991 Jaguar bearing motor vehicle identification number SAJTW4845MC179488 through Lone Star Auto Auction in Lubbock, Texas, for $14,925. The "seller" of the Jaguar was Roscoe White, individually. Manheim financed the purchase of the Jaguar for Family Auto. It was later determined that Roscoe White never gave up possession of this motor vehicle. Roscoe White later paid Manheim the original purchase price for the Jaguar.

defendant herein, Randall Marlon Hurst d/b/a Genie Auto Sales. Manheim financed the purchase of the pickup for Family Auto.

11. On or about the 26th day of May, 2004, Family Auto purchased a 2002 Chevrolet Tahoe pickup bearing motor vehicle identification number 1GNEK13Z32R145832 through Lone Star Auto Auction in Lubbock, Texas, for $27,900. The seller of the Tahoe was the debtor and defendant herein, Randall Marlon Hurst d/b/a Genie Auto Sales. Manheim financed the purchase of the Tahoe for Family Auto. The Tahoe was later repossessed and sold by Manheim.

12. On or about the 9th day of June 2004, Family Auto purchased a 1995 Nissan Maxima bearing motor vehicle identification number JN1CA21D6ST663715 through Lone Star Auto Auction in Lubbock, Texas, for $4,425. The seller of the Nissan was the debtor and defendant, Randall Marlon Hurst d/b/a Genie Auto Sales. Manheim financed the purchase of the Nissan for Family Auto. At present, the Nissan has not been located.

13. On or about the 30th day of June, 2004, Family Auto purchased a 1997 Pontiac Sunfire bearing motor vehicle identification number 1G2JB5240V7523260 through Lone Star Auto Auction in Lubbock, Texas, for $4,575. The seller of this car was J. R. Davis, an employee of Family Auto. The Sunfire was later repossessed and sold by Manheim. At the time the Sunfire was repossessed it was wrecked and had no engine.

To summarize from the foregoing stipulations, seven of the vehicles purchased by Family Auto (and thus financed by Manheim) were sold by Roscoe White and/or his company CLF Century & Loan Finance, Inc.; three were sold by Hurst individually doing business as Genie Auto Sales; J. P. Davis, an employee of Family Auto, sold one car to Family Auto. The stipulated facts do not identify the seller of the 1998 Chevrolet pickup.

Other pertinent facts were elicited from the evidence presented at trial. Though each vehicle was sold to Family Auto through an auto auction, Lone Star Auto Auction, every transaction constituted a "counter-sale," meaning the seller set the sales price as opposed to the price resulting from a true live auction of the vehicle. Manheim financed the full purchase price of each vehicle. In each case, Lone Star presented Manheim with a bill of sale reflecting the purchase price. The bills of sale used for each of the transactions do not designate that the sales were counter-sales, *i.e.* not by auction. Some of the bills of sale are initialed by an "auctioneer" thereby giving the impression the vehicle was in fact sold by auction.

Family Auto defaulted on the financing causing Manheim to repossess and dispose of the cars that it had financed.[2] The following chart sets forth, as to each vehicle, the amount financed and the loss realized by Manheim on each car:

| Vehicle Description | Amount Financed | Loss |
|---|---|---|
| 1998 Chevrolet Pickup | $12,625 | $ 11,997 |
| 2001 Dodge Intrepid | 7,875 | 6,531 |
| 1997 Dodge Caravan | 4,275 | 3,566 |
| 2000 Ford Focus | 5,780 | 1,942 |
| 2000 Ford Pickup | 8,980 | 4,691 |
| 2001 Chevrolet Cavalier | 5,580 | 4,549 |
| 1996 Ford F-150 Pickup | 8,880 | 7,958 |
| 1994 Jeep Grand Cherokee | 4,775 | 2,134 |
| 2001 Ford F-150 Pickup | 23,100 | 8,216 |
| 2002 Chevrolet Tahoe Pickup | 27,900 | 12,888 |

[2]As the parties stipulated, the 1995 Nissan Maxima has not been located.

| | | |
|---|---|---|
| 1995 Nissan Maxima | 4,425 | 5,018 |
| Pontiac Sunfire | 4,575 | 4,075 |
| **Total** | **$118,770** | **$ 73,565** |

In July 2003, Hurst transferred his stock in Family Auto to Jeff and Ray Linder. At the time, Hurst had left Lubbock and was running a used car lot in New Braunfels, Texas. The Linders had obtained a second source of inventory financing for Family Auto through Roscoe White and his company CLF Finance. CLF Finance extended a credit line of $400,000. Hurst, still involved with Family Auto despite having transferred his stock to the Linders, guaranteed the debt to CLF Finance. Hurst was also financing the purchase of inventory through Manheim for the lot he operated in New Braunfels. Family Auto apparently defaulted on the CLF Finance loans, resulting in CLF Finance foreclosing its liens. CLF sued the Linders on their guaranties. Hurst was not sued as he assisted CLF Finance in disposing of their repossessed inventory of cars.

Genie Auto Sales was not operated on the same lot as Family Auto. Hurst did not specifically advise Manheim that he owned Genie Auto Sales or that it was a sole proprietorship of his. Hurst was able to sell to Family Auto through the auto auction because he held two dealer's licenses which enabled him to sell and buy as a "dealer."

The standard practice of Manheim in approving credit for each sale dictated that Manheim finance 100% of the purchase price on an auction sale, but only 80%, at a maximum, of a non-auction sale. Therefore, had Manheim known that each of the twelve cars being financed were counter-sales it would have financed no more than 80% of the purchase price of each car.

**Discussion**

Manheim contends it was intentionally and fraudulently induced by Hurst to "over-finance" each of the vehicles subject of the described transactions. Manheim objects to the dischargeability of its debt under section 523(a)(2)(A) of the Bankruptcy Code. Section 523(a)(2)(A) states in relevant part:

> [a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). The terms "false pretenses," "false representation," and "actual fraud," as used in the dischargeability exception, have acquired the meaning of terms of art and are common law terms. *See In re Mercer*, 246 F.3d 391 (5th Cir. 2001), citing *Field v. Mans*, 516 U.S. 59 (1995).

For a debt to be nondischargeable under the discharge exception for debts obtained by false pretenses, a false representation, or actual fraud, the creditor must show, by a preponderance of the evidence, that (1) the debtor made a representation, (2) the debtor knew the representation was false, (3) the representation was made with the intent to deceive the creditor, (4) the creditor actually and justifiably relied on the representation, and (5) the creditor sustained a loss as a proximate result of its reliance. *See In re Acosta*, 406 F.3d 367 (5th Cir. 2005). Concealment of or silence regarding a material fact can constitute a fraudulent misrepresentation. *See Mercer* at 404; *see also Acosta* at 372. A misrepresentation need not be spoken; it can arise by conduct. *Mercer* at 404.

The Supreme Court clarified the reliance element in *Field v. Mans*, 516 U.S. 59, 73 (1995), where it said "[f]ollowing our established practice of finding Congress's meaning in the

generally shared common law when common-law terms are used without further specification, we hold that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance."

1. Representation and Knowledge of Falsity

Hurst orchestrated the twelve purchases of vehicles that are the subject of this lawsuit. Each sale was, as described, a counter-sale, meaning the seller set the price rather than by a true auction. This caused an over-financing by Manheim, *i.e.*, the extension of more credit than justified by the value of each vehicle, given the agreement between the parties. Hurst knew this was happening, Manheim did not. Hurst obviously set the price for each in which Genie Auto Sales was the seller. As for the sales from Roscoe White and/or CLF Century & Loan Finance, Inc. to Family Auto, Hurst's affiliation with Roscoe White and his relationship with White's company indicates he influenced the seller's side of each of the sales from White/CLF to Family Auto. In effect, Hurst was involved on both the seller's and buyer's side of each transaction.

The evidence reflects that Lone Star Auto Auction prepared the bills of sale and presented them to Manheim for purposes of effecting the sale. The bills of sale are not technically inaccurate. The problem was that Manheim assumed the sales price reflected on the bills of sale was the result of a true auction. After all, the bills of sale were issued by an auto auction and several were initialed by an "auctioneer." The question, then, is whether Hurst made an affirmative misrepresentation or merely "allowed" Manheim to make advances based on a fundamental misunderstanding of the facts. The facts justify a finding that Hurst is guilty of both an affirmative misrepresentation and of multiple concealments of a material fact. Hurst knew the sales were not by auction and that the price for each vehicle would be reflected on the bills of sale issued by Lone Star Auto Auction. He also knew Manheim relied upon the bills of sale in making

its advances. Finally, he knew Manheim was advancing the full purchase price rather than the 80% that was contemplated for a non-auction sale. The sales took place at a time when Hurst was experiencing financial difficulties and within the few months prior to his bankruptcy filing. His conduct in orchestrating each transaction created a false impression as to Manheim. Such conduct warrants a finding of debt obtained through "false pretenses" as contemplated by section 523(a)(2) of the Bankruptcy Code. *Deutsche Financial Services Corp. v. Turner*, 2003 WL 23838108 (Bankr. D. Kan. 2003).

Stated in a different way, Hurst's failure to advise Manheim that each sale was a counter-sale rather than an auction sale constitutes a concealment of a material fact sufficient to support a charge of fraud. *See Loomas v. Evans*, 181 B.R. 508, 514-15 (Bankr. S.D. Cal. 1995). In *Field v. Mans*, the United States Supreme Court, in discussing the meaning of false pretenses, false representation, and actual fraud, stated as follows: "the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976) . . . ." *Id*. at 70.

The Restatement (Second) of Torts § 551 states:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> > (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
> > (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> > (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

The nondisclosure of a material fact when there is a duty to disclose has been held to constitute the type of fraud necessary to except a debt from discharge. *See In re McDaniel*, 181 B.R. 883 (Bankr. S.D. Tex. 1994) (holding omission with design to cheat constitutes actual fraud); *Matter of Weinstein*, 31 B.R. 804 (Bankr. E.D. N.Y. 1983) (stating where debtor was aware of false impression on part of lender and did nothing to dispel it, lender's $100,000 over-advance guarantee was result of debtor's false pretenses, and thus nondischargeable); *In re Arlington*, 192 B.R. 494 (Bankr. N.D. Ill. 1996) (omissions or failure to disclose on part of debtor can constitute misrepresentations, for purposes of discharge exception for false pretenses, where circumstances are such that omissions or failure to disclose create false impression which is known by debtor).

According to the Restatement, the duty to disclose exists when one party to a business transaction knows of facts and "the other is about to enter into [the transaction] under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Restatement (Second) of Torts § 551(2)(e). Put simply, if Party 1 is under a mistaken impression as to the truth of a set of facts and Party 2 is aware of the truth and of the mistaken impression, Party 2 is under a duty to correct that mistake prior to the consummation of the transaction. Had Manheim known each sale was a counter-sale, it would not have advanced the full purchase price.

Hurst knew Manheim was advancing funds based upon the information contained on the bills of sale and Hurst intentionally remained silent regarding the advances, knowing the advances were made on the assumption that the sales were auction sales.

2. Intent to Deceive the Creditor

Intent of a kind sufficient to preclude discharge of debt for money obtained by debtor's false pretenses, false representation or actual fraud, may be inferred where a debtor makes a false representation and knows or should know that statement will induce another to act. *See In re Duggan*, 169 B.R. 318 (Bankr. E.D. N.Y. 1994). When deciding whether a creditor has satisfied the "intent" prong of a "false pretenses" dischargeability exception, the bankruptcy court must consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor, indicating an intent to deceive his creditor. *In re Patrick*, 265 B.R. 913 (Bankr. N.D. Ohio 2001). Intent to deceive is present if a debtor intends or has reason to expect a creditor to act, or to refrain from action, in reliance upon the debtor's misrepresentation; a result is intended if a debtor either acts with desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct. *E.g., In re Mercer*, 246 F.3d 391 (5th Cir. 2001) (citing Restatement (Second) of Torts § 531 (1977)).

Hurst intended to obtain an advance of 100% of the sales price of each vehicle purchased by Family Auto. Hurst knew that Manheim would be induced to extend such credit based on the information contained in the bills of sale. The misrepresentation of the character of the purchases was not an isolated, one time occurrence; rather, it was a repeated pattern of deception over many months. As the Fifth Circuit held in *In re Mercer*, intent to deceive is present, sufficient to except from discharge, if a debtor intends *or has reason to expect* a creditor to act, or to refrain from

action, in reliance upon the debtor's misrepresentation. *Id*. Hurst had, at a minimum, the expectation that Manheim would cover the full cost of each vehicle based on the information contained in the bills of sale. Hurst's conduct satisfies the intent to deceive element.

3. Actual and Justifiable Reliance

The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent or obvious or there are "red flags" indicating such reliance is unwarranted. *See Field*, 516 U.S. at 71. The "actual reliance" standard requires little of a creditor, who must prove only that he in fact relied on representations of the debtor. *See In re Mercer*, 246 F.3d 391 (5th Cir.2001).

Manheim clearly relied on the bills of sale that indicated true auction purchases by Hurst. The established arrangement between the parties was that Manheim would finance a maximum of 80% of counter-sale purchase prices and 100% of true auction purchases. As Manheim financed 100% of the purchase prices of the vehicles at issue, actual reliance is demonstrated.

Manheim was also reasonable and justified in its reliance, though reasonableness is not required. *Field*, 516 U.S. at 73. Hurst and Manheim had a two and one-half year business relationship prior to the purchases at issue. There is no indication that any purchases prior to June of 2004 had been suspicious or misrepresented. Manheim was justified in its reliance on the bills of sale as presented.

4. Losses Sustained

Manheim contends it may not have continued financing Family Auto had it known Hurst had sold his interest in Family Auto to the Linders or that Hurst owned Genie Auto Sales. The Court is not convinced of this, however. Manheim knew Hurst was involved in multiple dealerships. Manheim representatives made periodic inspections of Hurst's lot in New Braunfels, Texas, and of the Genie Auto Sales' lot. Hurst and Manheim had a close, on-going relationship as required by a typical floor-plan financing arrangement. The Court is convinced that Manheim representatives were aware of Hurst's involvement with other dealerships. The Court is also convinced that Manheim would have continued to finance Family Auto had it specifically considered Hurst's circumstance. The claim arising from Hurst's fraud, therefore, is measured by the *additional* funding provided by Manheim as a result of the fraud. As to each of the twelve sales, Manheim would have financed no more than 80% of the purchase price. Manheim's total claim is $73,565. Hurst did not provide sufficient evidence to rebut Manheim's claim or the reasonableness of Manheim's recovery upon repossession of the vehicles. Given that the Court finds that Manheim would have still financed at least 80% of the purchases, its loss occasioned by Hurst's fraud should be calculated based upon the difference between Manheim financing at 100% of the sales price and 80% of the sales price represented by the bills of sale. The loss based upon 100% financing is $73,565. The Court has calculated that the loss would have been $49,811 had the sales been financed at 80% of the sales price.[3] The difference is $23,754 which constitutes the amount of the claim caused by Hurst's fraud and is the amount deemed to be nondischargeable.

---

[3]The Court's calculations are based on the information contained on the chart in the Statement of Facts. The Court assumes that the difference between the amount financed and the loss set forth on the chart represents the net credit given upon repossession and sale of each vehicle.

The court will enter judgment declaring that Hurst is not discharged from $23,754 of the Manheim debt, with interest to accrue at the federal judgment rate.

### End of Memorandum Opinion ###